UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,  )
        Plaintiff,  )
        )
v.  )  Civil Action No. 04-30175-MAP
        )
$35,000 IN U.S. CURRENCY,  )
        Defendant.  )

### VERIFIED COMPLAINT FOR FORFEITURE IN REM

The United States of America, by its attorney, Michael J. Sullivan, United States Attorney for the District of Massachusetts, in a civil action of forfeiture pursuant to Title 21, United States Code, Sections 881(a)(6) and (b), alleges that:

1. This Court has jurisdiction in this matter pursuant to 28 U.S.C. §§ 1345, 1355, and 1356. Venue is appropriate pursuant to 28 U.S.C. § 1395.

2. The *in rem* Defendant Currency is now, and, during the pendency of this action, will be within the jurisdiction of this Court.

3. The Defendant Currency consists of $35,000 in United States currency, seized from William Guilbe on or about February 11, 2003, at Holyoke, Massachusetts (the "Defendant Currency").

4. As detailed in the Affidavit of United States Drug Enforcement Administration Special Agent John Barron, attached hereto as Exhibit A, and incorporated herein by reference, the United States has probable cause to believe that the Defendant Currency represents moneys, negotiable instruments, securities,

1

or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of the Controlled Substances Act, Title 21, United States Code, Sections 801 et seq., proceeds traceable to such an exchange, and/or moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of the Act.

5. The Defendant Currency is, therefore, subject to seizure and forfeiture to the United States of America, pursuant to 21 U.S.C. §§ 881(a)(6) and (b).

WHEREFORE, the United States of America prays:

1. That a warrant and monition, in the form submitted herewith, be issued to the United States Marshal for the District of Massachusetts commanding him to: (a) seize the Defendant Currency; and (b) give notice to all interested parties to appear and show cause why the forfeiture should not be decreed;

2. That judgment of forfeiture be decreed against the Defendant Currency;

3. That thereafter, the Defendant Currency be disposed of according to law; and

4. For costs and all other relief to which the United States may be entitled.

                                      Respectfully submitted,
                                      MICHAEL J. SULLIVAN
                                      United States Attorney

                                By: /s/ Shelbey D. Wright
                                    SHELBEY D. WRIGHT
                                    Assistant U.S. Attorney
                                    1 Courthouse Way, Suite 9200
                                    Boston, MA 02210
                                    (617) 748-3100

Dated: September 7, 2004

## AFFIDAVIT OF JOHN BARRON

I, John Barron, hereby depose and state under oath:

1. I am a Special Agent of the United States Drug Enforcement Administration ("DEA"), and have served in this capacity for approximately 3 years. I am responsible for investigations focusing on the importation and distribution of illegal narcotics. I have participated in the execution of numerous search warrants and arrests, and have been involved in the investigation of many drug trafficking organizations. Prior to my employment with the DEA, I was employed as a United States Border Patrol Agent with the Immigration and Naturalization Service, in San Diego, CA, for approximately three years. Through my training and experience I have participated in the investigation of complex drug conspiracies, and possession with intent to distribute illegal narcotics in violation of 21 U.S.C. §§ 841(a)(1), 843(b), 846, 848, 952(a), and 963.

2. Through investigations and training I have become familiar with the methods, language and terms which are used to disguise the source and nature of illegal narcotics activities. I am currently assigned to the Drug Enforcement Administration, New England Field Division, Springfield Resident Office (hereinafter referred to as "SRO"). The SRO is comprised of agents of the U.S. Drug Enforcement Administration (DEA) as well as officers of the following police departments: Springfield,



Holyoke, Chicopee, Westfield and West Springfield, MA tasked together to investigate and assist in prosecuting drug offenses. The SRO also receives assistance from other federal, state and local agencies on a case specific basis.

3. The information contained in this Affidavit was either observed by me or related to me by other law enforcement officers involved in this investigation. I submit this Affidavit in support of a Complaint for Forfeiture in Rem against $35,000 in United States currency, seized from William Guilbe on or about February 11, 2003, at Holyoke, Massachusetts (the "Defendant Currency"). As set forth below, I have probable cause to believe that the Defendant Currency represents moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of the Controlled Substances Act, Title 21, United States Code, Sections 801 et seq., proceeds traceable to such an exchange, and/or moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of the Act and therefore is subject to seizure and forfeiture to the United States pursuant to 21 U.S.C. §§ 881(a)(6) and (b).

4. The information contained in this affidavit is based on my personal involvement in the investigation of the criminal activity described herein, as well as information provided to me

by other members of law enforcement, my examination of records and documents, my training and experience and information provided by a Cooperating Sources, (hereinafter referred to as "CS1" and "CS2", regarding some of the principals. CS1 and CS2 are deemed to be reliable and accurate because they were in a position to have personal knowledge of the information they have provided. Much of the information they have provided has been corroborated by independent investigation and prior investigations conducted by the DEA SRO and the Holyoke Police Department (HPD). None of the information provided by CS1 or CS2 been shown to be false.

5. This Affidavit does not discuss all of the evidence obtained during the investigation, but only that which I believe is necessary to establish probable cause to support the Complaint for Forfeiture in Rem.

**BACKGROUND INFORMATION**

6. From April 2002, through the present, the SRO and other law enforcement agencies have been conducting an investigation, regarding cocaine and crack cocaine trafficking. The activity has been occurring in western Massachusetts, primarily in the cities of Holyoke, Chicopee, and Springfield. The investigation focused on the distribution network of Alexander Perez ("Alexander Perez"), Miguel Perez, a/k/a "MONSTRO" ("Miguel Perez"), Carlos Benitez, a/k/a "K-LO" ("Benitez"), Luis Machuca,

a/k/a "JEDI" ("Machuca") and others, known and unknown, and the source organizations, which are run by William Guilbe, a/k/a "GETTY" ("Guilbe"), Eduardo Gonzalez, a/k/a "PANCHO" ("Gonzalez"), Roberto Echeverrua, a/k/a "COLORADO" ("Echeverrua"), Francisco Alamo, a/k/a "ROXY" ("Alamo"), and others, known and unknown. The SRO and other law enforcement organizations, during the course of this investigation, utilized normal investigative techniques and several Court ordered wire intercepts including: the Perez Intercept, the Guilbe/Gonzalez Intercept, and the Gonzalez/Echeverria Intercept, pursuant to Court Orders signed by the Honorable Frank H. Freedman, United States District Judge, District of Massachusetts, and filed under M.B.D. No's. 02-MC30060-FHF; 02-MC30064-FHF; and 03-MC30001-FHF.

## The Investigation

ALEXANDER PEREZ

7. On or about October 18, 2002, Judge Freedman signed a Title III Wire Intercept ("T-III") order, which authorized the interception of conversations over Alexander Perez's cellular telephone. Monitoring began on or about October 25, 2002, and conversations were monitored until November 19, 2002.

8. During the course of the interceptions it became clear that Alexander Perez had a large street level retail cocaine business. Alexander Perez sells cocaine in 1/16; 1/8; and 1/4 ounces, and occasionally an entire ounce at a time. Alexander

Perez was intercepted arranging to deliver cocaine to his customers as well as discussing amounts of money his customers owed to him.

9. It became apparent almost immediately that Alexander Perez's suppliers are William Guilbe and Eduardo Gonzalez. Alexander Perez called Guilbe at cellular telephone number (413) 530-8768, which is subscribed to by William G. Guilbe, 62 Roberto Clemente Street, Holyoke, Massachusetts, and he called Gonzalez at cellular telephone number (413) 348-0561, which is subscribed to by Eduardo Gonzalez, 35 Pearl Street, Holyoke, Massachusetts.

10. On or about October 26, 2002, the following series of telephone calls were intercepted on Perez's cellular telephone. These calls demonstrate that Alexander Perez bought his cocaine from Guilbe and Gonzalez. At approximately 12:29 pm, Alexander Perez called Guilbe, a/k/a Getty, and left a message on Guilbe's cellular telephone voice mail and said he needed "two tokies", a reference to two ounces of cocaine. At approximately 12:59 pm, Alexander Perez called Gonzalez on his cellular telephone and asked if he knew where Getty was. Gonzalez said Getty must be at his house. Alexander Perez said he needed "two tokies" (based on my training and experience, I know "two tokies" to mean two ounces of cocaine), and that he will be there in 20 minutes. Gonzalez said that Alexander Perez should come and get them. Alexander Perez told Gonzalez that Omar Last Name Unknown (LNU)

went to get them the stuff last night but that Gonzalez locked the door. At approximately 1:10 pm, Guilbe used his cellular telephone to call Alexander Perez and said that Alexander Perez did not have to come over because Guilbe would bring them to Alexander Perez. At approximately 1:49 pm, Alexander Perez called Guilbe on his cellular telephone and asked if Guilbe already brought them down yet. Guilbe told Alexander Perez to come down. Within minutes surveillance agents observed Alexander Perez exit his residence, 82 Roberto Clemente Street in Holyoke, enter his vehicle, and drive a short distance down the street and park in front of Guilbe's residence, 62 Roberto Clemente Street, and enter the residence. At approximately 2:30 pm, Alexander Perez called Guilbe on his cellular telephone and Alexander Perez complained the stuff was too powdery, an apparent reference to the quality of the cocaine Guilbe had just sold to Alexander Perez.

11. On or about November 1, 2002, at approximately 10:14 am, an undercover DEA agent ("UCA") called Alexander Perez and ordered three ounces of crack cocaine. Alexander Perez said he had the stuff but had to have the other guy cook it. The UCA told Alexander Perez to call him back and let him known how long it would take. Between approximately 10:14 am and 10:21 am, Alexander Perez called Echeverria six times but only got his voice mail. At 10:24 am, Alexander Perez called the UCA and said

-6-

it would take one and a half hours and it would cost $3,100. At 10:45 am, Alexander Perez called Echeverria and asked him if he could cook the crack cocaine for him. Echeverria told Alexander Perez to come to his house and bring some baking soda, an ingredient used in making crack cocaine from cocaine. Alexander Perez called Echeverria back and asked if he needed to mix anything else with the cocaine and baking soda and they discussed adding rum to the mixture. Echeverria told Alexander Perez to bring a bowl to mix the ingredients. Several minutes later Alexander Perez called Echeverria and asked whether he was supposed to get baking soda or powder and Echeverria said he had some baking soda and he just needed a bowl.

12. At approximately 12:40 pm, the UCA called Alexander Perez and asked if the crack was ready. Alexander Perez said it would be ready at 1:00 pm, and they agreed to meet at the McDonald's on south Main Street, Springfield, Massachusetts. At approximately 1:00 pm, the UCA went to the McDonald's and purchased three ounces of crack cocaine from Alexander Perez. Lab analysis revealed that the bag contained 81.9 grams of cocaine base.

13. While buying the crack from Alexander Perez, the UCA asked Alexander Perez if he could get the UCA three ounces of powder cocaine. Alexander Perez told the UCA that he would need about one hour to obtain the cocaine and they agreed to meet

-7-

later that day.

14. At approximately 1:10 pm, surveillance was established on Alexander Perez as well as on Guilbe's residence and Gonzalez's residence. At approximately 1:10 pm, Alexander Perez began calling Guilbe's (413) 530-8768 cellular telephone. Alexander Perez and Guilbe spoke seven times beginning at 1:10 pm, arranging for the delivery of the three ounces of cocaine the UCA ordered from Alexander Perez. During the first call Alexander Perez said he needed three "tokies" (ounces) and Guilbe said he "ha[d] to grind it and prepare it. That will take approximately an hour." At 1:15 pm, Alexander Perez called the UCA and said it would be ready in one hour.

15. At approximately 1:39 pm, HPD Detective Arthur Cranshaw observed Guilbe exit residence and drive away in his white Dodge Dakota truck. At approximately 1:40 pm, Task Force Agent ("TFA") Dermit Hurley ("TFA Hurley"), observed Alexander Perez drive away from 32 Southern Drive, Chicopee, Massachusetts. At 1:49 pm, during an intercepted conversation, Guilbe told Alexander Perez he was on his was to Gonzalez's house to get the cocaine. Alexander Perez wanted to come to Gonzalez's house but Guilbe told him not to and said they could meet nearby.

16. At approximately 1:54 pm, TFA Eldon Wallen ("TFA Wallen") observed Guilbe arrive at Gonzalez's residence operating his white Dodge Dakota truck and enter the residence. At 2:05

-8-

pm, Alexander Perez called the UCA and said it would be ready in 20 minutes and they agreed to meet in the K-Mart parking lot. At 2:09 pm, Alexander Perez called Guilbe and said he wanted to stop buy to pick up the cocaine but Guilbe told Alexander Perez to meet him near the park. At approximately 2:10 pm, Special Agent ("SA") Jonathan Shankweiler ("SA Shankweiler") and TFA Wallen observed Perez driving down Pearl Street in Holyoke, towards the residence of Gonzalez, and then Alexander Perez turned off Pearl Street and drove away from the residence without ever stopping at Gonzalez's residence. At approximately 2:22 pm, Alexander Perez called Guilbe's cellular telephone but Gonzalez answered. Gonzalez said Guilbe was on the way. At approximately 2:25 pm, I observed Perez parked on Lincoln Street in Holyoke, in an open parking lot below Stop and Shop, next to a small park.

17. At approximately 2:30 pm, Springfield Police Department (SPD) Detective Pablo Diaz ("Det. Diaz"), observed Guilbe arrive and park next to Alexander Perez. Det. Diaz further observed Perez get out of his vehicle, approach Guilbe's truck and meet with Guilbe at the driver's side window of Guilbe's truck. SA Shankweiler then followed Guilbe back towards 34 Pearl Street in Holyoke. Alexander Perez was followed directly to the meeting with the UCA and at approximately 2:37 pm, Alexander Perez sold the UCA three ounces of powder cocaine. Lab analysis revealed that there were 83.1 grams of cocaine in the bag. At 2:55 pm,

Alexander Perez was intercepted talking to Guilbe about giving Guilbe the money Alexander Perez owed Guilbe for the cocaine.

WILLIAM GUILBE AND EDUARDO GONZALEZ

18. As a result of the Alexander Perez wire, on or about November 20, 2002, Judge Freedman issued an order authorizing the interception of conversations over cellular telephone numbers (413) 348-0561, Eduardo Gonzalez's cell phone, and (413) 530-8768, William Guilbe's cell phone. Interceptions began on November 21, 2002. During the second wire it became clear that Guilbe and Gonzalez were partners in a cocaine distribution business which sold approximately one kilogram of cocaine per week. They sold mostly in quantities of one ounce or more but were intercepted discussing sales as small as an eight ball (based on my training and experience, I know an eight ball to equal one-eighth of an ounce of cocaine). As set forth above, Guilbe and Gonzalez were the primary source of supply for Perez as demonstrated by the three ounce deal between Perez and the UCA.

19. Guilbe and Gonzalez frequently discussed the fact that the cocaine was stored at Gonzalez's 34 Pearl Street, Holyoke, residence. Guilbe was frequently recorded discussing the fact that he had access to the house and the cocaine any time he wanted. Guilbe and Gonzalez appeared to have several sources of supply for cocaine, including Ruben Arturo Falu-Mendez

-10-

("Mendez").

20. On or about November 27, 2002, at approximately 1:29 pm, agents overheard a conversation intercepted over the Guilbe cellular telephone between a Dominican male, later identified as Ruben Arturo Falu-Mendez, and Guilbe.

21. Using the code word "girl" for a kilogram of cocaine, Mendez asked Guilbe if Guilbe wanted Mendez to bring Guilbe one kilogram of cocaine. Guilbe said yes.

22. On or about November 30, 2002, another conversation between Guilbe and Mendez was overheard at approximately 8:46 am. During that call, Mendez agreed to deliver to Guilbe the cocaine they had previously discussed, in one-half hour.

23. At approximately 9:10 am, surveillance was established at Guilbe's residence. At approximately 9:21 am, SA Robert Olsen ("SA Olsen"), observed a blue Volvo (NH Temporary Plate 188791) arrive and back into Guilbe's driveway. SA Olsen observed Mendez exit the vehicle and knock on the door of Guilbe's residence. Agents observed the front door open and observed Mendez have a brief conversation with someone before walking away from the door and returning to the vehicle. At approximately 9:22 am, agents observed Mendez re-enter the vehicle and sit in the driver's seat for approximately one minute. Agents were unable to see what Mendez was doing inside the vehicle. At approximately 9:23 am, agents observed Mendez again exit the vehicle and walk towards

the Guilbe's front door. Agents then observed Mendez as he approached Guilbe's front door, holding both of his arms under his jacket as if he was holding something of significant weight inside the jacket. Agents observed that as Mendez approached Guilbe's door, Mendez removed one hand from under his jacket to open Guilbe's door, but kept the other hand underneath his jacket supporting whatever was inside his jacket.

24. At approximately 9:38 am, agents observed Mendez exit Guilbe's residence and enter the vehicle. Mendez was walking normal and his hands were not holding or carrying anything as he exited Guilbe's residence. At approximately 9:39 am, TFA Hurley observed Mendez drive away from Guilbe's residence.

25. At approximately 10:58 am, West Springfield Police Department Officer Michael Ganello and the DEA initiated a traffic stop on Mendez for speeding on Riverdale Road in West Springfield, Massachusetts. The driver immediately produced a Florida driver's license and identified himself as Ruben Arturo Falu- Mendez.

26. During conversations intercepted after the motor vehicle stop, Guilbe said that he had just received a whole one and needed to get it to the other place, believed to be Gonzalez's house.

PEDRO RODRIGUEZ

27. Another source of supply for Guilbe and Gonzalez was learned to be Pedro Rodriguez ("Rodriguez"). On or about January 10, 2003, Guilbe and Gonzalez were intercepted discussing the fact that they had not been able to reach Mendez for a re-supply of cocaine. Later that day Pedro Rodriguez called Guilbe and asked if he needed "work" and said that he could set one-half aside for him for 14. Guilbe said "my stuff is coming ... I'll wait for mine." One minute later Rodriguez called and asked Guilbe if he wanted to go half and half on a whole one for 23. Guilbe said that he would do it for half of 23. Guilbe said he would bring the money to Rodriguez in ten minutes.

28. At approximately 6:18 pm, surveillance agents observed Guilbe drive the short distance from his residence to Rodriguez's house at 45 Meadow Street, Holyoke, Massachusetts, where he remained for an hour. While Guilbe was at Rodriguez's house, surveillance agents observed several individuals, one of whom was known to agents to be Jose Hernandez, come to the house and enter. At about 7:30 pm, Guilbe left Rodriguez's house and was intercepted calling Gonzalez. Guilbe told Gonzalez that he left Rodriguez's house and that "the shit was no good... he called his guy and told him to come an get it." Guilbe said he had already given Rodriguez the money and that Rodriguez was going to try to get better cocaine and if he could not Guilbe was going back to

get his money later.  At 8:10 pm, Mendez called and Guilbe asked "When are you going to give me my food" and Mendez responded Sunday.  Guilbe said "someone is going to give me some tomorrow" and that Guilbe did not want to wait until Sunday.

29.  At approximately 8:31 pm, Rodriguez called and said they are going to bring me a different one, and Guilbe told him to call if it was good.  Rodriguez also said he had Guilbe's money.  At approximately 8:57 pm, Rodriguez called Guilbe and said "the stuff arrived ... its good, good, good."  Guilbe said he would come to Rodriguez's house tomorrow morning to get it.  Immediately after that call, Guilbe called Gonzalez and told him to call Mendez and "tell him that to forget it because they brought us something good, we have half put aside at Angelo's house."

30.  On or about January 11, 2003, at approximately 9:38 am, Guilbe called Rodriguez and said he was at Rodriguez's house and wanted his stuff.  Rodriguez said he was in Springfield and would be right back.  At approximately 10:32 am, Guilbe called Mendez and said he was "all set, the other guy brought something good."  At approximately 10:40 am, Rodriguez called Guilbe and said he would be leaving Springfield soon, but that if Guilbe needed it now he could go to Rodriguez's house and pick it up.  Guilbe said he did not have a car and would wait.  At approximately 11:18 am, Rodriguez called Guilbe and said he would bring it to Guilbe

right now. Surveillance agents observed Hernandez driving a BMW with Rodriguez as the passenger. They arrived at 45 Meadow Street and Rodriguez went into the house while Hernandez waited in the car. Rodriguez got back into the car after less than two minutes but the agents could not see if he had anything in his hands. The Holyoke Police Department stopped the BMW at the request of the DEA. On the back floor behind the passenger side seat a knapsack was found which contained one-half kilogram of cocaine. Both Rodriguez and Hernandez were arrested on state charges and held in lieu of bail. Guilbe and Gonzalez were intercepted in numerous calls after the arrests in which they complained they lost the half kilogram of cocaine and $11,500.

ROBERTO ECHEVERRIA, JR.

31. During the Guilbe/Gonzalez T-III, it became apparent that one of their main suppliers was Roberto Echeverria, Jr. The third T-III order signed on or about January 8, 2003, involved Guilbe's cellular phone and a cellular phone used by Echeverria. However, by the time the T-III began, Echeverria had stopped using the phone so agents applied for a fourth order, which was granted on or about January 30, 2003, for Echeverria's new cellular telephone.

32. During intercepted conversations, Echeverria was overheard arranging to sell Guilbe and/or Gonzalez large quantities of cocaine. For instance, on or about December 2,

2002, Guilbe ordered 200 (grams) of cocaine from Echeverria. Echeverria told Guilbe that he would leave it at the crazy woman's (Dycia Santos') house. Agents followed Echeverria to Santos's house. The next day Guilbe was observed going into Santo's house. Later that day Guilbe called Echeverria and said that "when I weighed one, it was missing sixteen." It is believed that Guilbe picked up two separate packages which were supposed to weigh 100 grams each, however one was 16 grams short. Echeverria told Guilbe "she gave you the wrong one then, I told her there were two, one that was complete and one that was missing some."

33. Further, on or about December 7, 2002, Gonzalez called Echeverria and asked for "a half," believed to be one-half kilogram of cocaine. Echeverria asked if Gonzalez wanted five (hundred grams) and Gonzalez said yes. Echeverria agreed to deliver it to Gonzalez's house. Several minutes after this call, agents followed Echeverria directly to Gonzalez's residence.

34. Again, on or about December 14, 2002, Guilbe ordered "five big ones" (five hundred grams) from Echeverria. The next day Guilbe called Echeverria and said he was coming by in 20 minuted to pick up "that." DEA agents observed Guilbe enter Echeverria's house, remain inside for half an hour, then followed him directly back to Gonzalez's house and saw him carrying a bag inside.

MIGUEL PEREZ

35. In addition, Miguel Perez, was also intercepted on numerous occasions on the Guilbe/Gonzalez intercepts arranging to purchase cocaine. On or about November 20, 2002, Guilbe and Miguel Perez were intercepted discussing the fact that Guilbe owed Miguel Perez 1850, and that Miguel Perez had recently taken one-half for one. Guilbe said he was going to bring the 1850 to Miguel Perez right away. Miguel Perez called Gonzalez 30 minutes later. Gonzalez asked if Miguel Perez needed anything, and Miguel Perez said he did. Gonzalez said he was out of his house going to a store, but he would be back soon. Gonzalez said Miguel Perez could call the other guy or wait for 20 minutes and Gonzalez would meet him. Gonzalez and Miguel Perez agreed to meet at Friendly's in 20 minutes. Ten minutes later Miguel Perez called Guilbe and wanted "to see if you can take care of me," but Guilbe said he was eating and could not be there for 40 minutes. Miguel said he would "check with the other guy." One hour later Miguel Perez called Gonzalez and they agreed to meet at a gas station.

36. On or about November 30, 2002, at approximately 9:38 am, Miguel Perez called Guilbe and said he wanted to stop by to get money and they agreed to talk again at 2:30 pm. At approximately 12:35 pm, Miguel Perez called Guilbe again and asked "do you have food." Guilbe said he had to make it and