Miguel said he wanted "four for eight." Guilbe asked where they should meet and Miguel Perez said "at home, so at the same time you get some money because I give you the money I have here." Guilbe said he was going to pick it up at Gonzalez's house and bring it to Miguel Perez. At approximately 1:00 pm, a surveillance agent observed at 84 Eastern Avenue, Chicopee, Massachusetts, brushing snow off his car. At approximately 1:05 pm, Guilbe arrived, parked his car and went inside Miguel Perez's apartment. One minute later, Guilbe exited Miguel Perez's apartment and drove away.

   37. On or about December 4, 2002, Miguel Perez called Guilbe and said he had just called Gonzalez, who told Miguel Perez to call Guilbe. Miguel Perez said he needed "a half for one." Guilbe said, "its going to have to be later on because there is very little left, there is a little over 100 pure, and that's too little to be worked on." Guilbe explained that "I'm going to bring half of the pure one and maybe more, so there will only be 70 left, so let me see if I can get something good." Guilbe said he would check around and Miguel Perez said that was "good because the guy has been waiting since yesterday." Miguel Perez said "let me know, otherwise I'll check somewhere else."

   38. Miguel Perez spoke to Gonzalez at approximately 3:32 pm, and asked if he prepared the food, and Gonzalez said yes. They agreed that Miguel Perez would be by at 6:00 pm. Gonzalez

-18-

said "you want half to make one" and Miguel Perez agreed and said he also wanted an additional seven. They then talked price. Miguel Perez asked if the 7 would cost 100. Gonzalez asked how much he (Guilbe) usually charged Miguel Perez. Miguel Perez said "the one you can make two out of one, 950." Miguel Perez said "that's if its pure, not if its cut." Miguel Perez said he wanted a complete one and a seven on the side. The investigation uncovered that Guilbe and Gonzalez sold two types of cocaine, pure and cut. Miguel Perez was ordering a quantity of pure cocaine for which he was to pay $950.

39. On or about December 9, 2002, Miguel Perez called Gonzalez and asked if he had food, and Gonzalez said yes. Miguel Perez said, "I need something now and something later on because I don't want to have anything on me all the time," and said, "I need one of the ones that you can make two out of one... two touched ones."

40. On or about December 12, 2002, at approximately 1:38 pm, Miguel Perez called Gonzalez and asked if Gonzalez had "work" and Gonzalez said yes. Miguel Perez said he needed two, and they agreed that Miguel Perez would come to Gonzalez's house. Miguel Perez said he was driving his wife's van. At approximately 1:56 pm, Miguel called again and said he would be there in 5 minutes, and Gonzalez said to come around back because he was working in the basement. At approximately 2:16 pm, a surveillance agent

observed Miguel Perez arrive at Gonzalez's house driving a minivan. Miguel Perez went into the house and was observed driving away four minutes later.

41. On or about December 17, 2002, Miguel Perez called Guilbe and asked "where are we at." Guilbe told someone in the background to go get the notebook, and Guilbe told Miguel Perez 5,700 altogether. Miguel Perez said he might stop by later because "they are going to bring me $4,000 so I can make a payment."

42. On or about December 18, 2002, at approximately 1:22 pm, Miguel Perez called Guilbe and asked if he was working. Guilbe said no, because he was doing something else but said he would call Gonzalez and see if he "can grind it for me." At approximately 4:18 pm, they spoke again, and Guilbe said, "I have that in my hands, what should I do?" Miguel Perez asked if Guilbe was at Gonzalez's house and Guilbe said yes. Miguel Perez said "don't leave then, bring me two more, but halves, .... bring two halves." Guilbe said, "you want two and two halves aside from that?" and Miguel Perez agreed. Miguel Perez said they could meet at his sister's house. At approximately 5:24 pm, a surveillance agent saw Guilbe leave Gonzalez's house and drive to 29/31 Belvedere Street, Holyoke, Massachusetts, the residence of Miguel Perez's parents. Five minutes later Miguel Perez arrived in another car, got out and walked up to the passenger's side of

Guilbe's car. Miguel Perez reached into Guilbe's car and remained at the car door for two minutes. Miguel Perez then walked into the residence and Guilbe left the area.

43. As discussed previously, on or about January 11, 2003, Pedro Rodriguez was arrested in possession of one-half kilogram of cocaine he was about to deliver to Guilbe. Shortly after the arrest, Miguel Perez called Guilbe who said he was not going to work that day because of the arrest of Rodriguez. Miguel Perez said he was looking for Rodriguez last night because he owes Miguel Perez$2,000. Guilbe then told Miguel Perez that he had given Rodriguez $11,500 last night. Miguel Perez called Guilbe again an hour and a half later and asked "doesn't your partner have anything going on aside from you?" Guilbe said "no there were like 80 and he had to take it out of the house because you never know." Guilbe said "that happened to me because I didn't wait for my people that were coming today."

44. On or about February 11, 2003, a search warrant was executed at Miguel Perez's residence. There was no cocaine found in the residence, however that is explained by the fact that on at least one occasion, Miguel Perez was intercepted saying he does not keep the cocaine very long. During the execution of the search warrant agents found $4,600 in the residence. Drug records found during the search of Guilbe's house have an entry "Monstro 900."

45. On or about February 11, 2003, search warrants were executed at Guilbe's residence, 64 Roberto Clemente Street, Holyoke, Massachusetts; Gonzalez's residence, 34 Pearl Street, Holyoke, Massachusetts; and, a duplex owned by Gonzalez at 33/35 Pearl Street, Holyoke, Massachusetts. Inside Guilbe's residence, 64 Roberto Clemente Street, agents seized approximately $36,000 in U.S. currency (one lot of currency in the amount of $1,000, and the Defendant Currency) and drug records. Inside 34 Pearl Street, agents seized just under two kilograms of cocaine, packaging material, a digital scale, and $19,800. Inside 35 Pearl Street agents seized approximately 200 grams of cocaine, cutting material, a sifter, mixer, baggies and other packaging materials.

### The Subsequent Criminal Case

46. On or about Feburary 27, 2004, a Federal Grand Jury handed down an Indictment charging Defendant William Guilbe, among others, with Distribution of Cocaine, Cocaine Base and Heroin and Conspiracy to Distribute and Possess with Intent to Distribute Cocaine, Cocaine Base and Heroin, in violation of 21 U.S.C. §§ 841 and 846 (*United States v. William Guilbe, et al.*, Criminal Action No. 03-30009-MAP).

47. On or about March 20, 2003, a Superseding Indictment was handed down by a Federal Grand Jury, again, charging William Guilbe, among others, with Distribution of Cocaine, Cocaine Base

and Heroin and Conspiracy to Distribute and Possess with Intent to Distribute Cocaine, Cocaine Base and Heroin, in violation of 21 U.S.C. §§ 841 and 846.

48. On or about April 22, 2004, William Guilbe pled guilty to Conspiracy to Distribute and Possession with Intent to Distribute Cocaine, Cocaine Base, and Heroin, and was sentenced to 72 months incarceration.

49. On or about May 28, 2004, Joseph Guilbe, the brother of William Guilbe, filed a claim to the Defendant Currency, which was seized from William Guilbe's residence (62 Roberto Clemente Street, Holyoke, Massachusetts) on or about February 11, 2003, during the Court authorized search of William Guilbe's residence.

50. Based upon the foregoing, along with the fact that Guilbe had no legitimate employment, I have probable cause to believe that the Defendant Currency represents moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of the Controlled Substances Act, Title 21, United States Code, Sections 108 et seq., proceeds traceable to such an exchange, and/or moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of the Act and therefore is subject to seizure and forfeiture to the United States

pursuant to 21 U.S.C. §§ 881(a)(6) and (b).

Signed under the pains and penalties of perjury this 7th day of September, 2004.

_____
JOHN BARRON
Special Agent
United States Drug Enforcement
Administration

## VERIFICATION

I, Special Agent John Barron, United States Drug Enforcement Administration, state that I have read the foregoing Verified Complaint for Forfeiture <u>In</u> <u>Rem</u> and the Affidavit, attached as Exhibit A, and that the contents thereof are true to the best of my knowledge, information and belief.

　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　Special Agent John Barron
　　　　　　　　　　　　　　　　　　United States Drug Enforcement
　　　　　　　　　　　　　　　　　　Administration

Dated: September 7, 2004



COMMONWEALTH OF MASSACHUSETTS

Hampden, ss.　　　　　　　　　　　　　　　　　　　　　　　Springfield

　　　Then personally appeared before me the above-named Special Agent John Barron of the United States Drug Enforcement Administration, who acknowledged the foregoing to be true to the best of his knowledge, information and belief, on behalf of the United States of America.

　　　Subscribed to and sworn to before me this ___7th___ day of September, 2004.

　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　Notary Public
　　　　　　　　　　　　　　　　　　My commission expires: 11/13/2009



LAURIE-ANN E. POTTER
NOTARY PUBLIC
COMMONWEALTH OF MASSACHUSETTS
My Commission Expires Nov. 13, 2009

4

## MASSACHUSETTS JURAT

Gov. Exec. Ord. #455 (03-13), §5(e)

Commonwealth of Massachusetts } ss.
County of _Hampden_

On this the __7th__ day of __September__, __2004__, before me,
__Laurie-Ann E. Potter__, the undersigned Notary Public,
(Name of Notary Public)

personally appeared __John Barron__,
(Name(s) of Signer(s))

proved to me through satisfactory evidence of identity, which was/were
__-personally Known by the Notary__,
(Description of Evidence of Identity)

to be the person(s) whose name(s) was/were signed on the preceding or attached document in my presence, and who swore or affirmed to me that the contents of the document are truthful and accurate to the best of his/her/their knowledge and belief.

_Laurie L.E. Potter_
Signature of Notary Public

**LAURIE-ANN E. POTTER**
**NOTARY PUBLIC**
**COMMONWEALTH OF MASSACHUSETTS**
**My Commission Expires Nov. 13, 2009**

_Laurie-Ann E. Potter_
Printed Name of Notary

Place Notary Seal and/or Any Stamp Above

My Commission Expires __Nov. 13, 2009__

──────────────── OPTIONAL ────────────────

*Although the information in this section is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

**Description of Attached Document**

Title or Type of Document: __Verified Complaint for Forfeiture in Rem__

Document Date: __9/7/04__   Number of Pages: __4__

Signer(s) Other Than Named Above: __Shelbey P. Wright__
__by Todd E. Newhouse__

**Right Thumbprint of Signer**

Top of thumb here

© 2004 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402 • www.NationalNotary.org
Item No. 5952                                   Reorder: Call Toll-Free 1-800-US NOTARY (1-800-876-6827)